## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PIERRE LaMONT LEAKE,

        Petitioner,

v.

JESSICA SYMMES,

        Respondent.

**Civil No. 10-2101 (SRN/SER)**

**<u>REPORT AND RECOMMENDATION</u>**

Pierre LaMont Leake, *pro se*, Minnesota Correctional Facility - Oak Park Heights, 5329 Osgood Avenue North, Stillwater, Minnesota, 55082.

Linda Kay Jenny, Esq., Assistant Hennepin County Attorney, C-2000 Government Center, 300 South Sixth Street, Minneapolis, Minnesota, 55487, for Respondent.

STEVEN E. RAU, United States Magistrate Judge

This matter is before the undersigned United States Magistrate Judge of the District Court on the Petition of Pierre LaMont Leake's Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent filed a response contending that the Petition should be dismissed, and Petitioner has filed a reply memorandum in opposition to the response. (Doc. Nos. 14-17, 22). The case has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court will recommend that Petitioner's Habeas Corpus Petition be **DENIED**, and that this action be **DISMISSED WITH PREJUDICE**.

## I.    BACKGROUND

In September 2003, a Minnesota state court jury found Petitioner guilty of first degree murder. He was sentenced to life in prison, and presently is serving his sentence at the Minnesota Correctional Facility in Oak Park Heights, Minnesota.

The factual background of this case is well summarized in the Minnesota Supreme Court's opinion in the direct appeal following Petitioner's conviction.  Both Petitioner and Respondent have quoted that summary at length in their respective submissions.  (Resp.'s Mem., [Doc No. 15], at 2-9; Pet.'s Mem., [Doc No. 22], at 7-13.)  The summary is rather lengthy, and most of it is not directly relevant to the issues presently before this Court, so it will not be fully quoted here. Instead, the Court will provide a brief background of the case, highlighting the parts that are most relevant to the resolution of the current Habeas Corpus Petition.[1]

On March 22, 2003, the body of Megan Fisher was found lying on her bed in her apartment.  She had been stabbed multiple times, and died from her wounds.

Fisher had been with some friends during the previous evening, and one of the friends dropped her off at her apartment at about 1:00 a.m.  Fisher talked to a friend on the telephone at about 1:40 a.m.  Her body was discovered by her roommate later that day.

During the weeks before Fisher was murdered, she had complained to her mother that Petitioner, who was a former boyfriend, was harassing her.  The police learned that Petitioner's cell phone had been used to call Fisher several times the night before her body was discovered. The cell phone records indicated that prior to 2:13 a.m., Petitioner's phone was used at or near his own home, but a call made at 2:45 a.m. originated someplace closer to Fisher's apartment.

At about 3:45 a.m., Fisher's roommate heard some noise in the apartment.  The roommate did not get up to investigate, but the next morning she noticed that a bath mat, a rug, and three towels were missing from the apartment.  The door to Fisher's bedroom was closed, and the roommate did not discover Fisher's body until she opened the bedroom door later that day.

---

[1]  The Minnesota Supreme Court's summary of the background of this case is set forth, verbatim and in its entirety, in the "Appendix" at the end of this Report and Recommendation.

Petitioner was married at the time of Fisher's murder, and was still living with his wife, Kathy Deutschlander.   Petitioner and Deutschlander, however, were divorced when Petitioner was tried.   According to Deutschlander, Petitioner was at home playing video games at 1:30 a.m. on the night of the murder.   Deutschlander later heard Petitioner taking a shower at about 6:00 a.m., and she did not think he had gone to bed that night.   When Petitioner got out of the shower, Deutschlander noticed that he had a bad cut on his right hand, which she had not seen when he was playing video games at 1:30 a.m.   She also noticed that Petitioner was "talking to himself " that morning, "reciting what sounded like a 'to-do list,' and putting items, including towels, a t-shirt, and sweat pants into a garbage bag."[2]

Further evidence was provided by another girlfriend of Petitioner, named Corrine Miller. She said that Petitioner came to her home at about 6:30 a.m. on the day when Fisher's body was discovered.   Petitioner asked Miller whether he could start a fire, and Miller later found Petitioner burning something in a backyard fire pit.   Miller said that there were fibers and stuffing in the yard.   Petitioner told Miller that he was burning a teddy bear, and some trash, but he refused to answer Miller's questions about the contents of a bag he had with him.   Miller also noticed the cut on Petitioner's hand, and she took him to a hospital to get the cut stitched and bandaged.

Fisher's roommate initially told the police that there were only two paring knives in the apartment at the time of the murder.   The roommate later recalled that Fisher purchased a set of knives that included a long serrated bread knife.   The roommate had seen the serrated knife in the apartment a few weeks before the murder, but that knife, as well as one of the two paring knives, could not be found after the murder.   A county medical examiner determined that Fisher's body

---

[2]   *State v. Leake*, 699 N.W.2d 312, 318 (Minn. 2005).

had at least seventeen stab wounds, and that a serrated knife like the one that was missing from Fisher's apartment inflicted some of those wounds.

When the police investigated Fisher's murder, they found blood-like substances in various places in Fisher's apartment.   Other substances were found under Fisher's fingernails.   Forensic testing revealed that some of those substances contained DNA that matched Petitioner's.

A grand jury indicted Petitioner on charges of first degree premeditated murder.   He was also charged with second degree intentional murder.   At the conclusion of Petitioner's trial, the petit jury found Petitioner guilty of first degree murder, but not guilty of second degree murder. The trial judge subsequently determined that Petitioner previously committed an offense that qualified as a "heinous crime" for purposes of Minnesota's sentencing laws.   Based on that determination, Petitioner was sentenced to life in prison, without the possibility of parole.

After Petitioner was convicted and sentenced, he took a direct appeal to the Minnesota Supreme Court.   In his appeal Petitioner contended that:   (1) the evidence introduced at his trial was not sufficient to prove beyond a reasonable doubt that he was guilty of premeditated murder, and (2) he was improperly sentenced to life in prison without parole.[3]   Petitioner also filed his own *pro se* supplemental brief in his direct appeal, (RA 43-62), presenting three additional claims:   (1) that the jury's "not guilty" verdict on the second degree murder charge was inconsistent with, and effectively nullified, the guilty verdict on the first degree murder charge, (RA 46-51); (2) that the grand jury's indictment should be "quashed," and the petit jury's verdict should be overturned, because of discrepancies between the evidence presented to the grand jury and the evidence presented at trial, (RA 52-57); and (3) that the verdict should be overturned because of several

---

[3]   The brief filed by Petitioner's counsel is included in Respondent's Appendix ("RA"). [Doc. No. 16, at 1-42].

4

instances of alleged prosecutorial misconduct during closing arguments, (RA 58-61).

The Minnesota Supreme Court considered and rejected claims raised in Petitioner's direct appeal. *See generally State v. Leake*, 699 N.W.2d 312 (Minn. 2005), [hereafter "*Leake I*"].[4]

In February 2006, Petitioner filed a *pro se* post-conviction motion in the state trial court, which raised four claims for relief. (RA 271-301.) In one of those claims, Petitioner contended that he had been deprived of his constitutional right to effective assistance of counsel at trial, and on appeal. Specifically, Petitioner argued that his trial attorney and appellate counsel did not properly challenge his former spouse, Kathy Deutschlander's, testimony.[5]

Without conducting an evidentiary hearing, the trial court denied Petitioner's post-conviction motion (RA 319-30). Petitioner filed another appeal. Petitioner's second appeal presented some of the same arguments that were raised in the post-conviction motion.[6] The trial

---

[4] *Leake I* is included in the present record at RA 176-94.

[5] Petitioner also argued that his trial counsel failed to adequately investigate a potential alibi witness, failed to object to an "ex parte" communication between the judge and jury, failed to adequately explain a proffered plea agreement, failed to object to several instances of hearsay testimony, and failed to conduct an adequate pre-sentence investigation regarding the possible use of a "diminished capacity defense." Petitioner also contended that: (1) he was denied a fair trial, because the trial court judge communicated with the jury during deliberations without Petitioner being present; (2) he was denied a fair trial, because the trial judge gave the jury several improper instructions; and (3) the trial judge failed to conduct all required sentencing investigations and hearings. These issues are not raised in the present habeas corpus Petition.

[6] It appears that the brief Petitioner filed in support of his post-conviction appeal is identical to the brief that he filed in the trial court, except that nine pages of the trial court brief, (pages 9-17), were omitted from the appellate court brief. This can be seen by comparing the trial court brief, (RA 271-301), to the appellate court brief, (RA 334-49 and RA 353-68). Petitioner's brief to the Minnesota Supreme Court is also accessible on Westlaw, and the Westlaw reproduction of the brief specifically notes, "Pages 9-17 missing in original document." *Leake v. Minnesota*, No. A06-1357, 2006 WL 4756195, at *17 (D. Minn. Oct. 16, 2006).
Although it appears that Petitioner's appellate brief omitted several arguments that were raised in his original trial court brief, it also appears that the Minnesota Supreme Court still reviewed and considered all of the arguments raised in the trial court – including the arguments

court's ruling on the post-conviction motion was upheld in all respects but one.   *Leake v. State*, 737 N.W.2d 531, 543(Minn. 2007) [hereafter "*Leake II*"].[7]   The Minnesota Supreme Court remanded the case to the trial court for further review of one of Petitioner's claims of ineffective assistance of appellate counsel.   The trial court was instructed to reconsider whether Petitioner was denied effective assistance of appellate counsel because of the failure to argue that trial counsel did not explain the prosecution's plea offer adequately.[8]

On remand, the trial court conducted an evidentiary hearing, and again concluded that Petitioner had not been deprived of his constitutional right to effective assistance of counsel on appeal.   (RA 420-28.)   Petitioner challenged that ruling in a third appeal to the Minnesota Supreme Court, but his arguments were rejected, and the trial court's final ruling on the post-conviction motion was affirmed.   *Leake v. State*, 767 N.W.2d *5, *11(Minn. 2009)

---

that were omitted from the appellate brief.   For example, the appellate brief omitted an argument that trial counsel erroneously failed to object to certain hearsay evidence, but the Minnesota Supreme Court nevertheless addressed that argument.   *See Leake II*, 737 N.W.2d at 542-43. Because the Minnesota Supreme Court apparently considered all of the arguments raised in Petitioner's brief to the trial court, this Court will assume, for now, that all of those arguments were fairly presented to the Minnesota Supreme Court – even though some of those arguments apparently were left out of Petitioner's appellate brief.

[7]   *Leake II* is included in the present record at RA 372-91.

[8]   As the Minnesota Supreme Court explained:

[W]e remand to the postconviction court to hold a hearing for the purpose of determining whether Leake's appellate counsel provided ineffective assistance when appellate counsel failed to bring this ineffective assistance of trial counsel claim.   As part of this hearing, it will likely be necessary to determine whether trial counsel's failure to advise Leake at the time of the plea offer that he faced a sentence of life in prison without the possibility of release constituted ineffective assistance of trial counsel and, if it did, whether there is a reasonable likelihood that Leake would have accepted the state's plea offer had he been properly advised.

*Leake II*, 737 N.W.2d at 541.

[hereafter "*Leake III*"].[9]

After *Leake III* was decided, Petitioner filed his current habeas corpus petition, requesting federal review of his conviction.   Two grounds for relief are identified.   First, Petitioner contends that he was deprived of his constitutional right to effective assistance of counsel at trial and on his direct appeal.   Second, Petitioner contends that his conviction should be overturned because of various errors and misconduct that allegedly occurred during the grand jury proceedings that precipitated his indictment.   For the reasons discussed below, the Court finds that Petitioner is not entitled to relief on any of the claims presented in his Habeas Corpus Petition.

## II.   PROCEDURALLY DEFAULTED CLAIMS

Petitioner's first habeas corpus claim, that he was denied his constitutional right to effective assistance of counsel, includes several subparts.   Two of those subparts cannot be adjudicated on the merits here, because they were not fairly presented to the Minnesota state courts, and they have been procedurally defaulted for federal habeas corpus purposes.

Petitioner contends that he was denied effective assistance of counsel during the original trial court proceedings, because: (1) his attorneys did not challenge certain allegedly unconstitutional jury instructions; and (2) his attorneys did not challenge alleged improprieties that occurred during the grand jury proceedings.[10]   Petitioner also argues that he was denied effective

---

[9]   *Leake III* is included in the present record at RA 606-14.

[10]   These two claims are described in the Petition as "Failure to object to unconstitutional jury instructions," and "Failure to seek dismissal of indictment."   (Petition, [Doc. No. 1], at (5), § 12.A., (3) and (4)).   The jury instruction claim is discussed in the memorandum in support of the Petition.   (Petitioner's Brief, [Doc. No. 22], at 14-16.)   The claim pertaining to the indictment is not discussed in either the Petition or the memorandum.   Petitioner apparently intended to argue that his trial counsel should have raised the same challenges to the grand jury proceedings that he has now raised in Ground Two of his current habeas corpus Petition.   *See infra* Discussion at 23-25.   However, no such argument is actually presented in any of Petitioner's submissions.

assistance of counsel in his direct appeal to the Minnesota Supreme Court, because his appellate counsel:   (1) failed to challenge the jury instructions and the grand jury proceedings in the appeal; and (2) failed to challenge the adequacy of the legal representation provided by his trial counsel with regard to those two issues.   None of these claims, however, were raised in any of Petitioner's prior state court proceedings, and it is too late for Petitioner to raise these claims in state court. Therefore, the doctrine of procedural default bars all of these claims.

### A.   Procedural Default Doctrine

A federal constitutional claim is reviewable in a § 2254 habeas corpus proceeding only if that claim was first fairly presented to the highest available state court.   28 U.S.C. § 2254(b)(1). The United States Supreme Court has explained this "exhaustion of state court remedies" requirement as follows:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights. . . .' To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. . . . (internal citations omitted).

*Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

"Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).   Thus, in Minnesota, a state prisoner must fairly present his federal constitutional claims to the Minnesota Supreme Court in order to satisfy the exhaustion of state court remedies requirement.

"When a state court remedy is available for a state prisoner's unexhausted claim, the federal habeas court must defer action until the claim is exhausted, either by dismissing the federal petition without prejudice or by using the 'stay and abeyance' procedure described in *Rhines v. Weber*, 544 U.S. 269, 274-75 (2005)." *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005), *cert. denied*, 546 U.S. 1179 (2006).   If a prisoner has not exhausted his state court remedies for some particular claim, and state procedural rules preclude any further attempts to satisfy the exhaustion requirement as to that claim, then the claim is not truly "unexhausted," but rather, it has been "procedurally defaulted." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997).   In other words, if there is still a state court remedy available, a previously unraised habeas claim is "unexhausted," but if there is no state court remedy still available, then the claim is "procedurally defaulted."   *See Armstrong*, 418 F.3d at 926 ("if no state court remedy is available for the unexhausted claim – that is, if resort to the state courts would be futile – then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim. . . .") (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)).

A procedurally defaulted claim that has been will not be entertained in a federal habeas corpus proceeding, unless the petitioner has shown "cause and prejudice" to excuse his procedural default, or, in the alternative, that there would be a "fundamental miscarriage of justice" if the federal court declined to consider the claim.   *Coleman*, 501 U.S. at 750.   In *Coleman*, the Supreme Court summarized the rules governing procedural default as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the

default and actual prejudice as a result of the alleged violations of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 725.

The "fundamental miscarriage of justice" exception (to overcome a procedural default) is available only upon a "showing, based on **new evidence**, that 'a constitutional violation has probably resulted in the conviction of one who is **actually innocent**.'"   *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995), *cert. denied*, 516 U.S. 1161 (1996) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)) (emphasis added).   In other words, a petitioner cannot simply point to errors that allegedly occurred during the course of his criminal prosecution; he must instead offer some **new** evidence that affirmatively demonstrates that he is, in fact, innocent of the crime for which he was convicted.[11]

### B.   Petitioner's Procedural Default

In this case, Petitioner's ineffective assistance of counsel claims based on the allegedly erroneous jury instructions and allegedly improper grand jury proceedings were never fairly presented to the Minnesota Supreme Court.   Petitioner did not raise any of these particular claims of ineffective assistance of counsel in *Leake II* or *Leake III*, and he did not raise **any** ineffective assistance of counsel claims in *Leake I*.

---

[11]   The actual innocence exception is concerned with claims of actual, not legal innocence.   It is evidence of factual innocence coupled with a constitutional violation which triggers the actual innocence exception.   Indeed, a credible claim of actual innocence 'requires [a] petitioner to support his allegation of constitutional error with new reliable evidence . . . '   Examples of evidence which may establish factual innocence include credible declarations of guilt by another.   (internal citation omitted).

*Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) *cert. denied*, 519 U.S. 972 (1996).

Furthermore, no state court remedy is still available for Petitioner's ineffective assistance claims stemming from the jury instructions and grand jury proceedings. The State of Minnesota has a well-established procedural rule that prevents state prisoners from seeking post-conviction relief based on claims that could have been raised in a direct appeal. *State v. Knaffla*, 243 N.W.2d 737, 740-42 (Minn. 1976). "When a direct appeal has been taken, all claims that were raised or could have been raised will not be considered in a petition for postconviction relief." *Doppler v. State*, 771 N.W.2d 867, 873 (Minn. 2009)*; see McCall*, 114 F.3d at 757 ("Minnesota law provides that once the petitioner has directly appealed his sentence 'all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief'") (citing *Knaffla*, 243 N.W.2d at 741).

Similarly, if a Minnesota prisoner has previously filed a state post-conviction motion, he cannot file another post-conviction motion bringing claims that could have been raised in the previous post-conviction proceedings. As the Minnesota Supreme Court explained:

> Once a petitioner has directly appealed his criminal conviction and has filed previous petitions for postconviction relief, any matter raised in the direct appeal or matters that were known to the defendant and could have been raised in the previous petitions will not be considered upon a subsequent petition for postconviction relief. (internal citation omitted) .

*Jones v. State*, 671 N.W.2d 743, 746 (Minn. 2003) (citing *Knaffla*, 243 N.W.2d at 741)*; see Doppler*, 771 N.W.2d at 873 ("our *Knaffla* rule bars claims that were raised or could have been raised in an earlier postconviction petition").[12]

---

[12] In *Jones*, the Minnesota Supreme Court noted that the *Knaffla* rule will not be applied in two rare scenarios:(1) "'where a claim is so novel that it can be said that its legal basis was not reasonably available to counsel at the time the direct appeal was taken and decided,'" and (2) "where fairness demands" that the prisoner's new claims be heard. *Jones*, 671 N.W.2d at 746, (quoting Case v. State, 364 N.W.2d 797, 800 (Minn. 1985)); *Fox v. State*, 474 N.W.2d 821, 825 (Minn. 1991). Neither of these exceptions to the *Knaffla* rule would be available to Petitioner,

All factual and legal basis for Petitioner's defaulted ineffective assistance of counsel claims were fully knowable when Petitioner previously sought post-conviction relief in state court. Petitioner did not raise any of these claims in his post-conviction motion, or in his subsequent appeal to the Minnesota Supreme Court, (*Leake II*).   Therefore, Petitioner's ineffective assistance of counsel claims pertaining to the jury instructions and grand jury proceedings have been procedurally defaulted.

### C. Cause and Prejudice or Actual Innocence

A final procedural default issue is whether Petitioner's default can be excused based on either cause and prejudice, or proof of actual innocence.   Petitioner made no effort to excuse his procedural default on either of those grounds, and the Court finds no conceivable means for him to do so.

In order to satisfy the "cause" requirement, a prisoner must show that some external impediment prevented him from presenting his claims to the state's highest court in a timely and procedurally proper manner.   *Coleman*, 501 U.S. at 753 ("'cause' under the cause and prejudice test is something **external** to the petitioner, something that cannot fairly be attributed to him . . . [f]or example, 'a showing that the factual or legal basis for a claim was not reasonably available . . . or that some interference by officials made compliance impracticable'") (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)) (emphasis in the original).   Petitioner made no effort to satisfy this standard, and the Court cannot discern independently any purely external circumstances that

---

because his defaulted ineffective assistance of counsel claims are not based on any new law, and he has offered no reason to believe that the Minnesota state courts would now conclude that "fairness demands" that these claims should be entertained at this late date.   *Fox*, 474 N.W.2d at 825.

could satisfy the *Coleman* "cause" requirement.[13]

Finally, Petitioner does not qualify for the "actual innocence" exception, because he has not presented any **new evidence** to demonstrate affirmatively that he did not commit the crime for which he was convicted.   All of Petitioner's current claims for relief involve alleged procedural errors that purportedly occurred before or during his trial.   He has not cited any new, previously undiscoverable evidence that would prove that he is innocent of the crime for which he was convicted.   Therefore, Petitioner cannot overcome his procedural default by way of the actual innocence exception.

Thus, the Court concludes that the doctrine of procedural default has all of Petitioner's ineffective assistance of counsel claims stemming from alleged instructional errors, and alleged improprieties during the grand jury proceedings.   None of those claims can be addressed on the merits and must be denied summarily.

## III.   DISCUSSION

### A.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 28 U.S.C.) ("AEDPA") prescribes the standards that govern this Court's substantive review of Leake's Habeas Petition.   The relevant portion of AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that

---

[13]   Because Petitioner has failed to satisfy the cause component of the cause and prejudice requirement, it is unnecessary to consider whether he could satisfy the prejudice component.   *Ashker v. Class*, 152 F.3d 863, 871 (8th Cir. 1998) (holding when petitioner "has not shown adequate cause to overcome the procedural bar . . . we need not consider the issue of actual prejudice.") (internal citation omitted).

was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 405-11 (2000), the United States Supreme Court discussed the meaning of the AEDPA and how federal district courts should apply it.   State court decisions are "contrary to" Supreme Court precedent under § 2254(d) when the state court:   (1) reaches a conclusion opposite to the Supreme Court on a question of law; or (2) arrives at a result opposite to Supreme Court precedent involving "materially indistinguishable" facts.   *Id*. at 405. The "unreasonable application" clause of § 2254(d)(1) provides that even if the state court correctly identifies the relevant Supreme Court principle, a federal court may grant a prisoner's writ if the state court applied the principle unreasonably to the facts of the case.   *Id.* at 413.   The standard for determining whether a state court's decision is an "unreasonable application," is "whether the state court's application of clearly established federal law was **objectively unreasonable**. . . ." *Id.* at 409 (emphasis added).   A writ may not be issued simply because the federal court concludes the state court's application of federal law was erroneous or incorrect, but only where the state court's decision was also unreasonable.   *Id.* at 411.

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   Habeas relief can therefore, be granted if the conviction is based on findings of fact that could not reasonably be

derived from the state court evidentiary record.   When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct," and such a presumption "may be rebutted only by clear and convincing evidence."  *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000).

Needless to say, a federal district court is not allowed to conduct its own *de novo* review of a prisoner's constitutional claims.   Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts.   Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted in *Williams*.

### B.   Ineffective Assistance of Counsel Claims

The current Petition presents several claims of ineffective assistance of counsel.   The claims pertaining to the jury instructions and grand jury proceedings have been procedurally defaulted because they were never presented to the Minnesota Supreme Court, and it is now too late to do so.   Petitioner's remaining ineffective assistance of counsel claims, however, which pertain to the testimony given by his ex-wife, Kathy Deutschlander, were raised and addressed in Petitioner's post-conviction proceedings.   Therefore, those claims can properly be entertained on the merits here.[14]

Petitioner contends that his trial counsel committed two errors involving the spousal

---

[14]   Actually, Petitioner's claims of ineffective assistance of trial counsel pertaining to the spousal communication privilege were procedurally defaulted, because they were not raised in Petitioner's direct appeal.   *See Leake II*, 737 N.W.2d at 538 (explaining "any inadequacies in trial representation were either known or should have been known to [Petitioner] at the time of his direct appeal, those issues are barred under the *Knaffla* rule").   However, Petitioner's claims regarding his trial counsel are intertwined with his claims regarding his appellate counsel, so all of those claims will be addressed together.   *See Tokar v. Bowersox*, 198 F.3d 1039, 1049 (8th Cir. 1999).

communication privilege.   First, counsel allegedly did not make an adequate effort before trial to show that Deutschlander's testimony involved actual "communication" between Petitioner and Deutschlander.   Second, when Deutschlander finally testified at trial, counsel allegedly failed to renew his previous objection to her testimony.[15]   Petitioner also claims that his appellate counsel erred on his direct appeal to the Minnesota Supreme Court, by (a) failing to raise the spousal communication issue in the appeal, and (b) failing to raise trial counsel's alleged errors concerning the spousal communication issue.

It is important to recognize at the outset that the spousal communication privilege is simply a state evidentiary rule prescribed by Minn. Stat. § 595.02, subd. 1(a) (2011) and is not recognized constitutionally.[16]   Therefore, Petitioner is not contending that Deutschlander's testimony was

---

[15]   These two alleged errors are described in the Petition as:   (1) "failure to offer evidence of known spousal communication;" and (2) "failure to object to the testimony of spousal communication."   (Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody) ("Pet.")[Doc. No. 1, at 5 § 12.A].   The two alleged errors are discussed together in Petitioner's memorandum, and they will be discussed together here too.   (Mem. of Law In Supp. of Pet. for Writ of Habeas Corpus) ("Pet.'s Mem.") [ Doc. No. 22, at 11-13].

[16]   This statute provides as follows:

> Every person of sufficient understanding, including a party, may testify in any action or proceeding, civil or criminal, in court or before any person who has authority to receive evidence, except as provided in this subdivision:
>
> (a) A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during the marriage.   This exception does not apply to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other or against a child of either or against a child under the care of either spouse, nor to a criminal action or proceeding in which one is charged with homicide or an attempt to commit homicide and the date of the marriage of the defendant is subsequent to the date of the offense, nor to an action or proceeding for nonsupport, neglect, dependency, or termination of parental rights.

barred constitutionally.   Rather, he is contending that state law barred her testimony, and that his counsel, both trial and appellate, did not challenge the admissibility of her testimony under state law.

The Minnesota Supreme Court explained the state evidentiary issue as follows:

Leake was married to Kathy Deutschlander at the time of the murder.   The state called Deutschlander as a witness.   Before she testified, Leake requested that she be precluded from testifying to any statements made by Leake to Deutschlander during marriage on the grounds that they were subject to the spousal communication privilege.   The state agreed that such statements should be excluded but contended that certain statements by Leake on the morning of the crime were not protected by the privilege.

The trial court heard offers of proof from both sides.   The state asserted Deutschlander overheard Leake make certain statements to himself that were not directed at Deutschlander.   Leake asserted that the statements in question were made to Deutschlander.   Based on these offers of proof, the court found that Leake's statements 'were not communications to the spouse * * * but in effect [were] overheard remarks by one spouse which turned out to be in the presence of the other,' and permitted Deutschlander to testify regarding those statements. Deutschlander then testified that she overheard Leake in the hours after the murder, talking to himself as if reciting a to-do list while placing clothes and towels in a bag....

Having carefully reviewed the record, we conclude that the trial court did not abuse its discretion when it found that Leake's statements, which were overheard by Deutschlander, 'were not communications to the spouse.'   Therefore, the trial court did not err when it permitted Deutschlander's testimony regarding those statements.

*Leake II*, 737 N.W.2d at 538-39.[17]

---

[17]   The Minnesota Supreme Court's ruling on the admissibility of Deustchlander's testimony is not reviewable in the present habeas corpus proceeding.   The United States Supreme Court has repeatedly held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (*per curiam*) ("[w]e have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). Therefore, this Court cannot review the state courts' determination that Deutschlander's testimony was not excludable under Minn. Stat. § 595.02, subd. 1(a).

After determining that Deutschlander's testimony was admissible under Minnesota law, the Minnesota Supreme Court considered whether Petitioner had been deprived of his constitutional right to effective assistance of counsel, because his attorneys did not properly object to the admission of Deutschlander's testimony. *Id.* To resolve that issue, the Minnesota Supreme Court applied the two prong test prescribed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 690-94 (1984). Under *Strickland*, the claimant must "'affirmatively show [1] that his attorney's representation fell below an objective standard of reasonableness, and [2] that but for the errors, the result would have been different.'" *Leake II*, 737 N.W.2d at 536 (quoting *Wilson v. State*, 582 N.W.2d 882, 885 (Minn. 1998)) (explaining *Strickland* test for postconviction relief). Applying the *Strickland* test, the Minnesota Supreme Court concluded that Petitioner could not sustain an ineffective assistance of counsel claim based on the admission of Deutschlander's testimony because that testimony was properly admitted. *Leake II*, 737 N.W.2d at 539.

The Minnesota Supreme Court obviously recognized and applied *Strickland* in adjudicating Petitioner's ineffective assistance of counsel. *Id.*; *see Williams*, 529 U.S. at 406 (when a state court applies a *Strickland* analysis to an ineffective assistance claim, the court has acted in accordance with—not contrary to—established federal law). Therefore, the only issue to be resolved here is whether Petitioner demonstrated that the Minnesota Supreme Court's ruling on his ineffective assistance claims involves an "unreasonable application of clearly established Federal law" to the facts of his case. 28 U.S.C. § 2254(d)(1). *See Williams*, 529 U.S. at 417 (Rehnquist, C.J., concurring in part and dissenting in part) ("[g]enerally, in an ineffective-assistance-of-counsel case where the state court applies *Strickland*, federal habeas courts can proceed directly to 'unreasonable application' review") (internal citation omitted).

Petitioner made no effort to show that the Minnesota Supreme Court's application of *Strickland* was "objectively unreasonable." He contends that his trial counsel should have offered additional evidence to show that Deutschlander's testimony was indeed a true interspousal communication excludable under § 595.02, subd. 1(a). Petitioner's trial counsel, however, did make an "offer of proof" pertaining to the expected testimony, and Petitioner has not shown how any additional evidence might have changed the trial court's ruling on the admissibility of Deutschlander's testimony.[18] *See Leake II*, 737 N.W.2d at 538.

Petitioner secondarily contends that his trial counsel should have objected to Deutschlander's testimony when it actually was presented at trial, but he has offered no reason to believe that any such objection would have been sustained. The trial court had already determined that Deutschlander would be allowed to testify about what she **observed**, (not what Petitioner told her), on the morning after Fisher's murder – i.e., that she **saw him** "talking to himself as if reciting a to-do list while placing clothes and towels in a bag." *Id*. Deutschlander apparently limited her testimony to matters already pre-approved by the trial court judge, and it therefore would have been futile (and perhaps counterproductive) to object to Deutschlander's trial testimony. Furthermore, the Minnesota Supreme Court explicitly ruled that Deutschlander's trial testimony **was** properly admissible under Minnesota law, and any further objection to that

---

[18]     Petitioner seems to argue that he was prevented from telling the judge that he was actually talking to Deutschlander when she overheard him reciting a "to-do list" to himself. This argument assumes, however, that the judge would have believed Petitioner's own self-serving statements, and disbelieved Deutschlander's explanation of what happened. If Petitioner was reciting a "to-do list" while putting clothes and towels into a bag – which Petitioner does not deny – it seems far more believable that he would have been talking to himself than to his wife. Thus, Petitioner has not shown that his own self-serving testimony, (or any other evidence), would have persuaded the trial judge to disallow Deutschlander's testimony based on the spousal communication privilege.

testimony would have been useless.   *Id.* at 538-39.

This Court is satisfied that the Minnesota Supreme Court's adjudication of Petitioner's ineffective assistance claims was not objectively unreasonable.   Petitioner's trial counsel cannot be faulted for not raising evidentiary objections that the Minnesota Supreme Court later found to be unsustainable.   *See Gray v. Bowersox*, 281 F.3d 749, 756 n. 3 (8th Cir. 2002), *cert. denied*, 537 U.S. 1115 (2003) (explaining ineffective assistance claim cannot be based on counsel's alleged failure to raise a meritless argument).   The Minnesota Supreme Court reasonably concluded that Petitioner's appellate counsel's failure to raise the same evidentiary objections on direct appeal did not prejudice Petitioner.   *See Thompson v. Jones*, 870 F.2d 432, 435 (8th Cir. 1988) (holding when a legal argument has no merit, a defendant is not prejudiced by his attorney's failure to raise it on appeal).   Nor was his appellate counsel's failure to challenge the trial attorney's failure to assert those objections prejudicial.   *See Zinzer v. Iowa*, 60 F.3d 1296, 1299 (8th Cir. 1995) ("Because [the petitioner's] ineffective assistance of trial counsel claim was unlikely to succeed on direct appeal, appellate counsel did not prejudice [the petitioner] by failing to raise the claim").[19]

In sum, when the Minnesota Supreme Court determined that Deutschlander's testimony was not excludable under Minnesota law, Petitioner's ineffective assistance of counsel claims

---

[19]   Even if Petitioner's attorneys had challenged Deutschlander's testimony more rigorously, the very most Petitioner could have hoped for would have been the exclusion of the testimony about Petitioner's verbal statement – i.e., the recitation of a to-do list.   Petitioner certainly could not have expected his attorneys to keep the jury from hearing about his **non-verbal behavior** on the morning of Fisher's murder – i.e., that he was placing clothes and towels in a bag.   Deutschlander's testimony about that purely non-verbal activity was highly inculpatory.   The testimony regarding the "to-do list" obviously was inculpatory too, but the outcome of Petitioner's trial did not hinge on that brief testimony alone.   Therefore, even if Petitioner's counsel could have successfully challenged Deutschlander's testimony regarding the to-do list, it is unlikely that the exclusion of that testimony, by itself, would have changed the outcome of the trial.   For this additional reason, Petitioner could not satisfy *Strickand*'s prejudice requirement.

pertaining to the admission of that testimony were extinguished effectively.   The Minnesota Supreme Court concluded that Petitioner's attorneys' failure to mount a more rigorous challenge to that testimony was not prejudicial, because no such challenge would have been successful.   *See Leake II*, 737 N.W.2d at 537-38.   Thus, the Minnesota Supreme Court properly applied the *Strickland* test, and reasonably determined that Petitioner could not satisfy the prejudice prong of that test.   It follows that Petitioner cannot be granted a writ of habeas corpus on his ineffective assistance of counsel claims stemming from the admission of Deutschlander's testimony.

### C.   Grand Jury Claims

Next, Petitioner contends that the grand jury's indictment was based on false testimony and prosecutorial misconduct.   Allegedly a police officer named Keefe provided false testimony.   According to Petitioner, Keefe told the grand jury that Fisher was stabbed with a serrated knife unlike any that were present in Fisher's apartment on the night she was murdered.   Keefe further testified that one of his colleagues confirmed that a set of knives owned by Fisher did not include a serrated knife like the putative murder weapon.   Thus, Keefe's testimony suggested that the murderer must have brought the murder weapon with him into Fisher's apartment, and that Fisher's murder must have been premeditated.   Before the beginning of Petitioner's trial, however, the prosecution determined that Fisher's knife set **did** include a serrated knife that could have been used as a murder weapon.   Therefore, Petitioner contends, Keefe's grand jury testimony regarding the knife must have been false.

Petitioner further alleges that Keefe told the grand jury he saw a milky white substance on Fisher's body, which appeared to be a lotion that might have come from a bottle found near Fisher's bed.   The prosecution nonetheless determined that the substance found on Fisher's body was not a lotion, and, according to Petitioner, none of this was ever brought up at his trial.   (Pet.'s

Mem. at 18-20).

Petitioner claims that his indictment for premeditated murder was based on Keefe's allegedly false testimony to the grand jury regarding the serrated knife and the lotion.   According to Petitioner, Keefe's testimony about "bringing a knife to the scene and rubbing 'lotion' on the victim's back was the 'crux' of establishing probable cause of premeditation."   *Id*. at 24. Petitioner claims that his murder conviction should be vacated because of Keefe's alleged false testimony to the grand jury and because of the prosecution's alleged misconduct in presenting that testimony to the grand jury.

Petitioner's *pro se* supplemental brief to the Minnesota Supreme Court in *Leake I* raised what is essentially the same claim.   The Minnesota Supreme Court decided this claim as follows:

> The final issue Leake raises in his pro se supplemental brief relates to alleged inconsistencies between the evidence presented before the grand jury and the evidence produced at trial.   Because a presumption of regularity attaches to an indictment, a defendant bears a heavy burden when seeking to overturn an indictment, particularly after the defendant has been found guilty beyond a reasonable doubt.   *State v. Lynch*, 590 N.W.2d 75, 79 (Minn.1999).   Having carefully reviewed the record, we conclude that Leake has not met this burden.

*Leake I*, 699 N.W.2d at 328.

Petitioner made no effort to show that the disposition of his grand jury claims in *Leake I* is contrary to, or an unreasonable application of, any United States Supreme Court decision. Moreover, this Court finds that *United States v. Mechanik*, 475 U.S. 66 (1986) supports this ruling.

In *Mechanik*, the Court held that a petit jury's conviction of a criminal defendant effectively invalidates any post-verdict challenge to the propriety of earlier grand jury proceedings.   *Id*. at 67.   The primary purpose of a grand jury proceeding is to determine whether there is probable cause to charge a person with a crime, and compel the person to stand trial.   *Id*. at 70.   After a petit jury has found a person to be guilty of a crime, beyond a reasonable doubt, the

probable cause requirement becomes nugatory.  *Id*.  As explained in *Mechanik*, "the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted."  *Id*. at 67.  In short, grand jury errors are rendered harmless by a subsequent guilty verdict.  *Id*. at 70.  ("[m]easured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt"); *see United States v. Tulk*, 171 F.3d 596, 598 (8th Cir. 1999) ("[a]ny injury sustained in the charging process is cured by a subsequent finding of guilt beyond a reasonable doubt") (internal citation omitted).

Petitioner cited three U.S. Supreme Court cases in support of his grand jury claims, but none of those cases is applicable here.  (Pet. Mem. at 22-23, 25).  First, in *Midland Asphalt Corp., Littner v. United States*, 489 U.S. 794, 797 n.1 (1989) the Court held only that an alleged violation of the Federal Rules governing grand jury proceedings cannot be raised in an interlocutory appeal.  Second, in *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) the Court held that a state criminal defendant's conviction is reversible where the prosecutor knowingly acquiesced to false testimony given at the defendant's **trial**, not grand jury proceedings.

The third case, *Vasquez v. Hillery*, 474 U.S. 254, 263-63 (1986), comes closest to being relevant here.  In that case, the Supreme Court set aside a guilty verdict that followed a racially discriminatorily tainted indictment.  The Court held that "discrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review."  *Id*. at 263-64.  But, the Court's subsequent decision in *Mechanik* suggests that *Vasquez* is limited to cases involving racial discrimination.  As the Court explained in *Mechanik*:

In *Vasquez. . .*, the Court set aside a final judgment of conviction because of racial

23

discrimination in the composition of the grand jury that indicted the defendant.   It found this result to be compelled by precedent directly applicable to the special problem of racial discrimination. . . . It also reasoned that racial discrimination in the selection of grand jurors is so pernicious, and other remedies so impractical, that the remedy of automatic reversal was necessary as a prophylactic means of deterring grand jury discrimination in the future, . . and that one could presume that a discriminatorily selected grand jury would treat defendants of excluded races unfairly. . . . **We think that these considerations have little force outside the context of racial discrimination in the composition of the grand jury.**   No long line of precedent requires the setting aside of a conviction based on a rule violation in the antecedent grand jury proceedings, and the societal interest in deterring this sort of error does not rise to the level of the interest in deterring racial discrimination. . . .

475 U.S. at 70-71 n. 1 (citations omitted) (emphasis added).   *See United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir. 1986) ("[e]xcept in cases involving racial discrimination in the composition of the grand jury, a guilty verdict by the petit jury generally excuses errors at the grand jury level that are 'connected with the charging decision'") (quoting *Mechanik,* 475 U.S. at 70); *United States v. McKie*, 831 F.2d 819, 822 (8th Cir. 1987) (same); *see also United States v. Console*, 13 F.3d 641, 672, (3d Cir. 1993), *cert. denied*, 511 U.S. 1076 (1994) ("[l]ike *Mechanik*, this case is distinguishable from *Vasquez*. . . because *Vasquez* involved the 'pernicious' problem of racial discrimination in the selection of grand jurors").

In sum, the Minnesota Supreme Court rejected Petitioner's challenges to the grand jury proceedings in his case, because any alleged errors during the charging process were rendered harmless when the petit jury found him guilty beyond a reasonable doubt.   Petitioner has not shown that this resolution of his grand jury claims was contrary to, or an unreasonable application of, any apposite holding of the United States Supreme Court.   In fact, the most apposite holding, *Mechanik*, clearly supports the decision of the Minnesota Supreme Court.   Therefore, Petitioner

cannot be granted a writ of habeas corpus on the second basis identified in his Petition.[20]

### D.  Certificate of Appealability

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his Petition unless he is granted a Certificate of Appealability ("COA").   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).   A COA cannot be granted, unless the petitioner "has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(3).   To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Slack v. Daniel*, 529 U.S. 473, 484 (2000).

In this case, the Court finds it unlikely that any other court, including the Eighth Circuit Court of Appeals, would decide Petitioner's claims any differently than they have been decided here.   Petitioner has not identified, (and the Court cannot independently discern), anything novel, noteworthy or worrisome about this case that warrants appellate review.   It is therefore recommended that Petitioner should **not** be granted a COA in this matter.

---

[20]   As an aside, the Court notes that the federal Constitution does not require **states** to conduct **any** grand jury proceedings.   *Cooksey v. Delo*, 94 F.3d 1214, 1217 (8th Cir. 1996), *cert. denied*, 522 U.S. 1027 (1997) (citing *Hurtado v. California*, 110 U.S. 516 (1884)).   *See also Branzburg v. Hayes*, 408 U.S. 665, 688 n. 25 (1972) ("indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"); *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972) ("the Court has never held that federal concepts of a 'grand jury'. . . are obligatory for the States") (internal citation omitted).   Because Petitioner had no federal constitutional right to any grand jury proceedings, the Court questions how his constitutional rights could have been violated by any error that may have occurred during those proceedings.

## IV.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.  Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254, (Doc. No. 1),

be **DENIED**;

2.  This action be **DISMISSED WITH PREJUDICE**; and

3.  Petitioner should **NOT** be granted a Certificate of Appealability.

Dated:    December 8, 2011

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 22, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

# APPENDIX

Factual background provided by the Minnesota Supreme Court in Petitioner's Direct appeal.   *State v. Leake*, 699 N.W.2d 312, 315-19 (Minn. 2005).

"On March 22, 2003, Angela Behling found her roommate, Megan Fisher, stabbed to death in Fisher's bedroom.   Fisher shared a two-bedroom Minneapolis apartment with Behling, whom she met while attending culinary school.   The apartment building was a secure building that required visitors to be let in using an intercom system at the front door.

Within two days of Fisher's murder, police arrested Leake.  Evidence presented at trial indicated that Leake and Fisher met in the fall of either 2001 or 2002 and that they developed a romantic relationship.   Behling testified that when Leake got together with Fisher, he would usually call Fisher late at night, come to the back door of the apartment building, and be let in by Fisher.   Behling did not always know that Leake had come to the apartment until Fisher told her the next day.   Behling also testified that, to her knowledge, Fisher did not give Leake a key to the apartment.

In the weeks prior to her murder, Fisher expressed frustration to her mother and a friend, Jenna Nerdby, because Leake would be late for dates or not show up at all.   She also complained to Behling that Leake was secretive and did not tell her anything about himself.

On March 14, 2003, Fisher went to a Minneapolis bar with some friends.   Leake met Fisher at the bar so Fisher could sell him a drug scale.   When Leake arrived, he and Fisher went outside.   Fisher saw that another woman, Corrine Miller, was waiting in Leake's car. Fisher, upset that Leake brought another woman with him to the bar, told Nerdby that she was 'done with this.'   Nerdby testified at trial that when Fisher said she was ' done with this,' Nerdby understood Fisher to mean done with everything to do with Leake – including their relationship.   Consistent with Nerdby's testimony, Behling testified that Fisher told her that same evening that she was done 'talking to [Leake], done with everything to do with him.'

A few days before her murder, Fisher told her mother that Leake was calling her all the time and she no longer wanted to take phone calls from him.   She also told her mother that Leake was 'harassing me, bugging me' and that because she did not want to talk to Leake, she no longer answered her phone unless she knew the number that appeared on her caller identification.

On March 21, 2003, a friend joined Fisher at her apartment before they went

to an office party at a bar.   Around 8:00 p.m., Fisher's cell phone rang and Leake's name appeared on her cell phone's caller identification.   Fisher told her friend not to answer the phone, but did not say why.   FN1

> FN1.   Cell phone records, introduced as exhibits at trial, confirm that a call was made at about 8:00 p.m. on the evening of March 21, 2003 from Leake's cell phone to Fisher's cell phone and that the call was not answered.

When several other friends arrived, including Fisher's roommate Behling, they all went to the office party.   After arriving at the bar, Behling did not feel well so Fisher and another friend, Bob Thompson, drove Behling back to the apartment at about 12:20 a.m.   Fisher and Thompson then left the apartment and met friends at another bar.   Thompson took Fisher home around 1:10 a.m., and at about 1:40 a.m., Fisher called a friend in California, Jennifer DeRosa.   DeRosa testified at trial that Fisher did not indicate that she was expecting company.   At 2:00 a.m., Fisher called one of the friends she had been out with that night and left a message on the friend's cell phone.

According to cell phone records, there was a call from Fisher's cell phone to Leake's cell phone at 1:27 a.m. on March 22. That call went to Leake's voicemail. At 1:54 a.m., Leake's voicemail was checked.   A three-minute phone call was made from Leake's cell phone to Fisher's cell phone at 1:56 a.m.   At 2:45 a.m., a one minute call was made from Leake's phone – with the number blocked – to Fisher's phone.   This was the only call from Leake's phone to Fisher's phone in the previous four months in which the phone number was blocked.

A representative from the cell phone company testified at trial about how cell phone calls are transmitted, explaining that, in the absence of an unlikely event, cell phone calls 'bounce off' the closest transmission tower before being transmitted to the receiver. According to the phone company's records, several calls from Leake's cell phone, between 1:30 a.m. and 2:13 a.m. on March 22, 2003, bounced off the cell tower near his New Brighton apartment.   The 2:45 a.m. call made from Leake's cell phone bounced off a tower in Minneapolis located near Fisher's apartment. Fisher's 1:27 and 1:40 a.m. calls bounced off this same tower near her apartment.

Behling did not hear Fisher arrive home in the early morning hours of March 22, but around 3:45 a.m., Behling was awakened by a noise in the apartment. Before falling back to sleep, Behling surmised that Fisher was awake, which surprised her.   When Behling woke up later that morning, she observed that Fisher's door was closed and that the bath mat, three bathroom towels, and the hall rug – all of which had been in the apartment the night before – were missing. Behling also noticed that the deadbolt lock on the apartment door was not locked. Although Behling found it strange that the door was unlocked and the rugs were

missing, she thought that Fisher had decided to launder the rugs and had simply forgotten to lock the apartment door.

Behling took a shower and left the apartment at about 10:00 a.m., locking the door on her way out.   Around 6:00 or 6:30 p.m., Behling returned to the apartment with plans to attend a wedding that evening with Fisher.   When she opened the door to Fisher's bedroom to find out when they were leaving, she discovered Fisher, lying on her bed, stabbed to death.   Behling called 911.

During their investigation, police and crime lab technicians searched the apartment and the surrounding area for evidence.   Fisher's cell phone and bathroom towels were never located, but the hallway rug with the bathmat rolled inside was found behind a dumpster in back of the apartment building.   The duvet and mattress cover on Fisher's bed contained several cuts and tears consistent with someone stabbing them.

On the day of the murder, Behling told police that the only knives she and Fisher kept in the apartment were two paring knives – one with a black handle and one with a red handle – but later remembered, and told the police, that she and Fisher had purchased knife sets for the culinary school they both attended. Behling testified at trial that she kept her knife set under her bed in her bedroom, where it was found covered in a layer of dust after the murder.   Behling also testified that Fisher kept her set in the kitchen on top of a cupboard with a long serrated bread knife sitting on top.   Behling said the serrated knife had been sitting on Fisher's knife set in the kitchen for months before the murder and that she specifically remembered seeing it there 'a few weeks' before the murder. The red-handled paring knife and the serrated bread knife were never recovered.   FN2

> FN2.   During the investigation, the police took Fisher's knife set to the culinary school and the director told them that a long serrated bread knife was missing from the set.   The police then obtained a replica of the missing knife, which was introduced into evidence at trial.

The police collected samples of 'blood-like substances' from numerous places in the apartment.   The Minnesota Bureau of Criminal Apprehension (BCA) tested those substances as well as a biological sample taken from underneath Fisher's fingernail.   At trial, a forensic scientist with the BCA testified that the samples taken from Fisher's bedroom wall and from other items in her bedroom matched Fisher's DNA profile.   Samples taken from the bathroom door, hall closet doorknob, kitchen floor, hallway floor, bath mat, area rug, and end table all matched Leake's DNA profile.   The sample from underneath Fisher's fingernail was a mixture consistent with a combination of DNA from Leake and Fisher. There was no predominant contributor to this mixture, and 99.9997% of the population could be excluded from having contributed to it.

Dr. Mitchell Morey, a Hennepin County assistant medical examiner, also testified at trial. He determined that Fisher died from multiple sharp-force injuries. According to Morey, sharp-force injuries fall into two categories:  (1) stab wounds, which are deeper than they are wide; and (2) incisional wounds, which are wider than they are deep.  Fisher had at least 17 stab wounds and at least five incisional wounds.  All of the wounds were consistent with having been inflicted by a knife.  Fatal wounds cut through her spinal cord, vertebral arteries, jugular vein, and vena cava.  Morey testified that at least some of the wounds were consistent with having been inflicted by a serrated blade.  According to Morey, those wounds were consistent with a replica of the serrated knife that was missing from Fisher's knife set.  The medical examiner could not determine in what order the injuries occurred or which of three potentially fatal blows actually killed Fisher. Fisher had few defensive wounds.

At trial, Kathy Deutschlander, Leake's ex-wife, also testified for the state. She was married to Leake at the time of the murder, but their marriage was dissolved prior to trial.  Deutschlander testified that at 1:30 a.m. on the night of the murder, her two-year-old son woke her up because he wanted something to drink. When she went to get her son a glass of milk, she saw Leake playing video games in the living room of their New Brighton apartment.  She spoke to him briefly, but did not notice any injury to his right hand.  Deutschlander did not believe that Leake came to bed that night, but heard him in the shower around 6:00 a.m.   Later, she observed that after his shower he was wearing different clothes than he had worn the previous night and that he had a 'bad cut' on his right hand. She also observed him talking to himself, reciting what sounded like a 'to-do list,' and putting items, including towels, a t-shirt, and sweat pants into a garbage bag. Deutschlander saw him take the garbage bag outside and place it inside their Jeep. He then moved a different garbage bag from the trunk of their Oldsmobile to the Jeep.  Deutschlander testified that, while watching him from the window of their apartment, she saw him drive the Jeep by the apartment dumpsters but she did not observe him dispose of the garbage bags.

Corrine Miller, Leake's friend and companion the evening Leake met Fisher at the bar to get a drug scale, also testified at trial.   Miller met Leake in November 2002 and they were in a relationship.   She testified that Leake arrived at her house outside Stillwater around 6:30 a.m. on March 22.   They had plans to meet to lift weights at 8:00 a.m., but she was not expecting him at her house before that time. When Leake arrived, he had a towel wrapped around his hand.   He told her that he had cut his hand on a piece of glass while taking out the garbage.   Before Miller left to run an errand, Leake asked if he could start a fire and she agreed.   Miller thought Leake wanted to start the fire in the inside fireplace because it was cold, but when she returned from her errand, she discovered that Leake had started a fire in the backyard pit.   While Miller was not sure what Leake was burning, she thought she saw fabric in the fire and 'stuffing' or 'fibers' all over the yard.   Leake told

Miller he was burning a teddy bear and trash, but when she asked about a bag of items that Leake had with him, he responded, 'you sure ask a lot of questions.' FN3   She did not question him further.

> FN3.   Fisher's brother testified at trial that Fisher had many stuffed animals in her bedroom.

Miller, who is a nurse, looked at the cut on Leake's hand and suggested he go to a nearby hospital to see a doctor.   At the hospital, Leake told the doctor, in the presence of Miller, that he had cut his hand on some broken glass while taking out the garbage.   Leake was irritable after the hospital visit and told Miller he needed to go home to see his son.   When Leake returned to his apartment, Deutschlander saw that Leake's hand had stitches and was bandaged.

At about midnight on March 23, the police arrested Leake at his home and searched the apartment.   In the early morning hours of March 24, and again later that day, police searched the garbage dumpsters around Leake's apartment but did not find any broken glass or blood.   FN4   Photographs of Leake's right hand, taken by police, showed a linear cut with several stitches.   Leake was charged with premeditated first-degree murder in violation of Minn. Stat. § 609.185(a)(1) (2004), and intentional second-degree murder in violation of Minn. Stat. § 609.19, subd. 1(1) (2004).

> FN4.   Police later searched Leake's Oldsmobile and collected several samples of blood-like substances.   The samples taken from the Oldsmobile matched Leake's DNA profile but the testing of the samples either excluded Fisher or failed to identify her as a contributor.

The jury returned a guilty verdict on the count of first-degree premeditated murder and a not guilty verdict on the count of second-degree intentional murder. At sentencing, the state presented evidence related to Leake's 1998 conviction for third-degree criminal sexual conduct.   This evidence was critical to the determination of whether Leake had previously been convicted of a 'heinous crime' under Minn. Stat. § 609.106 (2004), thereby requiring the trial court to sentence him to life imprisonment with no possibility of release.

*State v. Leake*, 699 N.W.2d 312, 315-19 (Minn. 2005).